## NELS G. BACKSTROM v. NEW YORK LIFE INSURANCE COMPANY.[1]

March 22, 1935.

No. 30,165.

[1]Reported in 259 N. W. 681.

See 183 Minn. 384, 236 N. W. 708; 187 Minn. 35, 244 N. W. 64.

*Doherty, Rumble & Butler* and *R. O. Sullivan,* for appellant.

*Oscar R. Knutson, F. W. Murphy,* and *H. O. Chommie,* for respondent.

DEVANEY, CHIEF JUSTICE.

This is an action upon a policy of life insurance containing a provision for added indemnity for death by external violence or accidental means. It is dated March, 1929, and was delivered in this state. The plaintiff in this case is the beneficiary. The action has been tried three times. The first trial resulted in a verdict of self-destruction but was reversed on appeal and a new trial ordered for errors of law occurring at the trial. Backstrom v. New York L. Ins. Co. 183 Minn. 384, 236 N. W. 708. The second trial again resulted in a verdict of self-destruction. Plaintiff moved for a new trial, and the court granted the motion. An appeal was taken from this order. This court dismissed the appeal on the ground that the order appealed from was not an appealable order. Backstrom v. New York L. Ins. Co. 187 Minn. 35, 244 N. W. 64. Thereafter defendant moved the trial court for an order vacating its previous order granting a new trial or for reargument or for the further order of the court denying plaintiff's motion for a new trial. Again defendant's motion was denied, and again defendant appealed from the order of the trial court. Plaintiff's motion to, dismiss the appeal was granted by this court without opinion. Thus the second trial was brought to an end. The third trial followed before a trial judge theretofore unconnected with the litigation and with additional counsel not before associated with the case. At the close of the third trial defendant's motion for a directed verdict having been denied, the jury returned a verdict in favor of plaintiff for the full amount sought, $4,960.66. Defendant's motion in the alternative having been denied, this appeal follows.

The brief facts are these: ` Alfred Backstrom was a normal, healthy youth, equipped with high school and business college training, employed as a bookkeeper at Thief River Falls, Minnesota, a short distance from his boyhood home. His habits were impeccable. He was quiet and reserved. He had no known enemies. He was successful in his employment. Alfred was last seen alive on Sunday, September 22, 1929, at about three p. m. in the bakery where he was employed. He did not return to his employment Monday morning. On October 7, 1929, his body was found in a wooded pasture about three-quarters of a mile south of the city limits of Thief River Falls and about 210 yards off a state highway. The body was lying on the right side with the face on the ground, the knees slightly curved, the right hand on the abdomen, the left hand somewhat lower and on the right side. His left leg rested on his right leg, and between the two, held in place by the weight of the left leg, was found a 38 Colt revolver with one cartridge discharged. Another like cartridge was found in the sweater pocket. The head and face were partly covered with a cap. Powder burns did not appear. The insured had been shot through the head. The revolver was identified as belonging to Alfred's employer. The two cartridges apparently had been taken from the employer's desk. The gun was double action. When fired the cylinder containing the cartridge does not revolve, but the hammer remains on the cartridge fired.

On the date of Alfred's disappearance his parents were in Minneapolis visiting his sister. Alfred left no letters or messages. A letter written shortly before his disappearance to his sister in Minneapolis inclosed a small check and was otherwise of ordinary tenor. His accounts with his employer were in good order. He had a small cash balance in the bank. No financial involvement or personal worry, the occasion of disaster in so many lives, appeared here. There was an entire absence of any showing of depression or melancholia, temporary or otherwise.

The assignments of error are 11 in number. The first relates to the second trial; the second and third to errors of law; and the fourth to eleventh, inclusive, to what is claimed to be erroneously

admitted testimony mostly from experts. Three points should be considered in reaching a decision in this case. (1) Is the question of alleged error in a previous trial of concern here? (2) Did plaintiff prove that Alfred's death resulted from accidental means? (3) Did the court permit the expert witnesses to invade the province of the jury?

■ There is no merit to defendant's endeavor to have reviewed here alleged errors based on the claimed arbitrary refusal of the trial court at the second trial to make his original order granting a new trial in the form of an appealable order. The general rule needs no restatement. 1 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) § 393a. This case, does not fall within that exception where the new trial is granted on only one issue or a part of the issues of a case. Here a new trial of all the issues was granted. Its effect was "to set aside entirely the trial, with all of its evidence and proceedings, and the case then stands precisely as if no trial had ever been had." McKenzie v. Banks, 94 Minn. 496, 497, 103 N. W. 497, 498. This appeal is from the order denying an alternative motion made by defendant after the third verdict and a trial on all the issues. The propriety of granting the third trial is therefore not before this court for review now.

■ Plaintiff had the burden of proving that the death of the insured resulted from accidental means. 5 Wigmore, Evidence (2 ed.) § 2510(c), p. 502. The gun was found between Alfred's legs held in place by the weight of the left leg resting on the right. Neither hand touched the gun, the butt of which was further between the legs than the muzzle. The position of the body and the place in which the gun was held were both unusual and could well permit of the conclusion that neither naturally followed suicide. In McAlpine v. Fidelity & Cas. Co. 134 Minn. 192, 202, 158 N. W. 967, 971, the court said:

"The circumstances surrounding the death of the insured being shown, a presumption may arise that it was accidental rather than suicidal, and as between accident and suicide the law for logical and sensible reasons supposes accident. The presumption may ob-

viate the necessity of further proof, or its force may be such that in a particular case a verdict may be directed for the plaintiff, but it does not change the burden in the first instance."

Plaintiff is thus aided by the presumption against suicide. The law knows no stronger presumption than that against self-destruction. Until Hawkins v. Kronick C. & L. Co. 157 Minn. 33, 195 N. W. 766, it was the rule in this state that the defendant, to sustain the burden against suicide, had to negative every reasonable hypothesis of natural or accidental death. This court limited this rule in the Hawkins case.

In the case at bar the triers of fact found that plaintiff came to his death from accidental means. Proof of motive for suicide is entirely absent. This boy was in splendid health, of even, though reserved, disposition, without financial or other apparent worry, successful in his employment, typical of the better class of boys developed throughout our state, and yet dead from a bullet. There is in our opinion full warrant for the verdict of the jury that he did not come to his death by his own hand. Plaintiff sustained the burden of proving death from accidental means, and the presumption against suicide was not as a matter of law overcome by the evidence submitted by defendant.

■ The trial court permitted the sheriff to lie down in front of the jury and to demonstrate the position in which he found the deceased's body as to posture and place of arms and legs. The sheriff was also permitted to place the gun in that identical position between his own legs in which he found it on the body of deceased. We see nothing either improper or prejudicial in this attempt to make visual the facts and to portray the posture and position of decedent's body.

Again the trial court permitted witness Mortenson to take the revolver and to hold it against his head in a position similar to that he believed must have been the position of the gun, had the deceased destroyed himself, and, as an expert, to conclude therefrom and from the absence of powder burns around the wound that a bullet entering the head at the right and traveling downward and·

out at the left could not have been fired from the gun found between deceased's legs. The court further permitted Mortenson to testify as to the possibility of the fatal shot having been fired while deceased was in a standing or lying position and whether such wounds as he had would result if the fatal shot was fired when the insured was lying on the ground. Point is made that Mortenson had not heard all of the testimony in the case but based his testimony on a description of the position in which the body was found, given by the sheriff, and the further testimony of the undertaker, while ignoring other testimony.

The trial court further permitted a human skull to be used for purposes of demonstration by the expert who testified. The question of the qualification of an expert witness is one peculiarly within the discretion of the trial court. His qualification is a question of fact.

"Whether a witness offered as an expert possesses the requisite qualifications is a question of fact to be decided by the trial court and its determination will not be reversed on appeal unless it clearly appears that it was not justified by the evidence." 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 3335, citing cases.

Expert testimony, being an exception to the general rule excluding opinions from evidence, is the least satisfactory type of evidence. That does not mean that it does not play a useful part in the trial of cases and the enlightenment of triers of fact. Dr. Mortenson might not have been the most erudite or best qualified expert who might be called to testify in this case. He did, however, submit his qualification to the court and did testify. Defendant had every opportunity to cross-examine and did so. The jury had no illusions respecting Dr. Mortenson's qualifications at the conclusion of the examination and must have accepted his opinion testimony for what it was worth. His testimony was fairly given under what might be urged to be a liberal view of the trial court respecting the reception of his testimony. However that may be, we cannot say that it was prejudicial to permit this testimony to be heard by the jury. The use of the skull was not improper.

It added no particularly gruesome detail to a sordid picture. If the jury could better understand the testimony of the witnesses by the use of a human skull and the trial court permitted its use, there is no reason why we should disturb that ruling. No prejudice could or did result.

There have been three trials of this case in a community in which it is difficult to select a jury not uninfluenced by extraneous facts and rumors, the verdict of the jury should not be disturbed, and the order of the trial court is therefore hereby affirmed.

JULIUS J. OLSON, JUSTICE, took no part.

[1]Reported in 259 N. W. 684.